UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE TORRES

-------------------------------------------------------x   13 CV   3870

13 Civ.

VICTORIA BURHANS and CHLOË RIVERA,

**COMPLAINT**

Plaintiffs,

-against-

PLAINTIFFS DEMAND
A TRIAL BY JURY

VITO LOPEZ and SHELDON SILVER,

Defendants.

RECEIVED

JUN 06 2013

U.S.D.C. S.D. N.Y.
CASHIERS

-------------------------------------------------------x

Plaintiffs Victoria Burhans ("Burhans") and Chloë Rivera ("Rivera")
(collectively, "plaintiffs"), by their counsel, The Law Office of Kevin Mintzer, P.C.,
complaining of defendants Vito Lopez ("Lopez") and Sheldon Silver ("Silver"), in their
individual capacities, (collectively, "defendants") allege as follows:

### NATURE OF CLAIMS

1.      Vito Lopez, a former member of the New York State Assembly (the
"Assembly"), used his public office to commit egregious acts of sexual harassment against
Burhans and Rivera, two women who worked in his district office.  Lopez's harassment of
plaintiffs included, among other things, unwanted physical contact, unwanted sexual advances,
and incessant comments about their bodies, clothing and appearance.  Lopez would not have
been able to abuse plaintiffs without the assistance of the Speaker of the Assembly, Sheldon
Silver.  Months before Lopez hired plaintiffs, Silver and his senior staff learned that at least two
other women on Lopez's staff had credibly complained that Lopez had sexually harassed them
and other employees.  Rather than refer those initial two complaints to the Assembly's
Committee on Ethics and Guidance ("Ethics Committee"), as was required by the Assembly's

sexual harassment policies, Silver and Lopez instead orchestrated a confidential payment to Lopez's previous victims and conditioned that payment on the victims remaining silent.  Silver and his staff made no attempt to investigate Lopez or to try to protect the other women on Lopez's staff.  As a result of Silver's complete failure to meet his obligations as the most senior official in the Assembly, Lopez continued his deplorable conduct and sexually harassed Burhans and Rivera.

2.      Plaintiffs bring this action to remedy discrimination on the basis of gender in employment, including hostile work environment sexual harassment, in violation of federal, state and city anti-discrimination laws, including the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States ("Equal Protection Clause") through 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 *et seq.* (the "NYCHRL").

3.      Plaintiffs seek injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to Section 1983, the NYSHRL, and the NYCHRL.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Victoria Burhans is a 27 year-old woman and is currently employed by the Assembly.  She is a resident of the State of New York.

5.      Plaintiff Chloë Rivera is a 25 year-old woman and is currently employed by the Assembly.  She is a resident of the State of New York.

6.      Sheldon Silver is the Speaker of the Assembly and is an Assemblyman from the 65th Assembly District, which is located in New York County.  Silver maintains one or

more offices within New York County and, on information and belief, resides in New York County.  At all relevant times, Silver acted under color of state law.

7.     Vito Lopez is a former Assemblymember from the 53rd Assembly District, which is located in Kings County.  He held that position from 1985 until he resigned his office on May 20, 2013.  On information and belief, Lopez resides in Kings County.  At all relevant times, Lopez acted under color of state law.

8.     This Court has federal question jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 and supplemental jurisdiction over plaintiffs' state and city law claims pursuant to 28 U.S.C. § 1367.

9.     This Court is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, Silver resides within the Southern District of New York and Lopez resides within the State of New York.

10.     Pursuant to § 8-502(c) of the NYCHRL, plaintiff will serve a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

<u>FACTUAL ALLEGATIONS</u>

<u>Background Concerning Lopez and Silver</u>

11.     Lopez is a former Assemblyman from the 53rd Assembly District, which is located in Kings County.  He held that office from 1985 until he resigned on May 20, 2013. While in the Assembly, Lopez was chair of the Assembly's Standing Committee on Housing for more than 15 years prior to being removed from that position on August 24, 2012.

12.     From approximately 2005 through late 2012, Lopez was also the Chairman of the Kings County Democratic Committee, which is one of the largest county affiliates of the Democratic Party in the United States.

13.     On information and belief, Lopez has for decades also maintained enormous influence on the operations of the Ridgewood Bushwick Senior Citizens Council ("RBSCC"), a non-profit organization Lopez founded in approximately 1973. RBSCC has for many years received millions of dollars in grants from state and city government.

14.     Due to his position in the Assembly and on the Kings County Democratic Committee as well as his influence on RBSCC, Lopez was one of the most powerful public officials in Brooklyn. Lopez "long presided over a political machine that rewarded protégés and friends with jobs, benefited favored contractors and bolstered his standing as one of the last of the city's political kingmakers." N.R. Kleinfield *et al.*, *If this Brooklyn Kingmaker is Asking, Saying No is Risky Option*, N.Y. Times, Sept. 5, 2012 at A1.

15.     Silver has served in the Assembly since 1977 and has been Speaker of the Assembly since 1994. Under the Rules of the Assembly, the Speaker has sweeping powers over the institution and other members, including but not limited to the right to name chairpersons and members of the various committees of the Assembly, the right to decide which bills are considered by the body, and the ability to control all Assembly property.

16.     Silver further exercises power in the Assembly "by rewarding his loyal supporters with higher-paying leadership posts, placing his allies throughout state government and using his considerable campaign war chest and redistricting know-how to assist any endangered Democratic candidates." Danny Hakim and Thomas Kaplan, *Very Bad Week is Merely a Bump for Assembly's Master of Power*, N.Y. Times, May 20, 2013 at A1. In addition,

Silver controls "where members park, the size and location of their offices and how much money they can spend on their staffs. [Silver] also can increase, or decrease, their pay, by offering them myriad leadership posts." *Id.*

17.     Under the Rules of the Assembly, the Speaker is required to promulgate a sexual harassment policy prohibiting sexual harassment by members of the Assembly and Assembly staff and to establish a process for the resolution of sexual harassment complaints.

18.     Despite these requirements, Silver has a history of not taking appropriate actions in response to credible allegations of sexual harassment.  In or about 2001, an employee of the Assembly, Elizabeth Crothers, accused a senior member of Silver's staff of sexually assaulting her.  Silver failed to ensure that a proper investigation was done or to take any meaningful action against the accused employee.  Two years later, the same senior member of Silver's staff, who still worked for Silver, was arrested for raping another woman and ultimately pled guilty to a charge of sexual misconduct.  Years later, having done nothing to help Elizabeth Crothers when he had the power to do so, Silver claimed he had "tremendous anguish about what Elizabeth Crothers went through."

The Assembly and Silver Cover Up Credible
Allegations of Sexual Harassment Against Lopez

19.     On or about December 8, 2011, months before plaintiffs began working for the Assembly, a woman on Lopez's staff communicated to Yolande Page ("Page"), the Assembly's Deputy Director of Administration, that Lopez had been sexually harassing her and other women on his staff.  The woman (hereinafter "Complainant 1") further communicated to Page specific details about Lopez's inappropriate conduct and asked Page whether Silver could talk to Lopez to make him stop.

20.     At the time that Complainant 1 spoke with Page, the Assembly's Sexual Harassment/Retaliation Policy stated the following concerning sexual harassment complaints against members of the Assembly:

> A complaint of sexual harassment and/or retaliation against a Member of the Assembly *shall* be referred to the Assembly Committee on Ethics and Guidance for investigation. The Committee *shall* conduct its investigation in the same manner described above with respect to investigation conducted by counsel. Upon conclusion of the investigation, the Committee *shall* report its findings to the Speaker and, as appropriate, the Minority Leader, accompanied by recommended remedy, or dispose of the matter in accordance with its policy regarding disciplinary matters.

(Emphasis supplied).

21.     Contrary to the requirements of this policy, Page informed Complainant 1 that if she wanted to make a formal complaint against Lopez, she was required to contact the Assembly's Office of Counsel for the Majority.

22.     On or about December 12, 2011, Complainant 1 spoke with Page again. Complainant 1 told Page that Lopez had fired her when Complainant 1 told him to stop sexually harassing her and then rescinded the termination. Complainant 1 also told Page that Lopez was harassing other women in the office. In response, Page reiterated that if Complainant 1 wanted to pursue a complaint against Lopez, she needed to contact either William Collins ("Collins"), Counsel for the Majority, or Carolyn Kearns ("Kearns"), Deputy Counsel for the Majority and Majority Counsel to the Ethics Committee. Collins reported directly to Silver; Kearns reported to Collins.

23.     On or about December 12, after Page spoke with Complainant 1, she had a telephone conversation with Silver and informed him that she had spoken with an employee in Lopez's office and there may be sexual harassment litigation filed. Thereafter, Silver mentioned

to Collins and Jim Yates, Counsel to the Speaker, that there might be an issue or incident in Lopez's office.

24.     On December 14, Complainant 1 sent an email to Lopez and copied it to Page, Collins and Kearns.  In the email, Complaint 1 wrote, in part:

> As you are fully aware, you fired me on Sunday, after a series of escalating incidents in which I repeatedly denied your sexual advances and told you to stop making sexual and other inappropriate remarks to me and other staff or to retaliate against me, and after I reported your behavior last week to human resources.

25.     After Collins and Kearns received copies of Complainant 1's email, they spoke with Page, who told them about her previous communications with Complainant 1, including the specific behaviors of Lopez that Complainant 1 had told her about.  Page also told Collins and Kearns that Complainant 1 was extremely distraught.

26.     On or about December 28, 2011, a second woman who worked on Lopez's staff (hereinafter, "Complainant 2") asked Page if she could file a sexual harassment complaint against Lopez.  Page referred Complainant 2 to Collins.

27.     Complainant 2 thereafter had a phone conversation with Collins and Kearns in which she detailed instances of Lopez's inappropriate conduct toward her and other female staff members.  Complainant 2 also stated that she wished to file a formal complaint against Lopez.  Collins and Kearns requested that Complainant 2 put her complaint in writing.

28.     On January 3, 2012, Complainant 2 sent an email to Collins in which she documented her complaint against Lopez.  The document began as follows:

> Here is a brief written follow-up to our phone conversation. In sum, Assemblymember Lopez has repeatedly made unwanted, unwelcome sexually suggestive comments directed at me and several members of the staff, as well as generally treating the

7

female members of the staff differently from the male staff members in ways that negatively impact how and whether the female members of staff are able to do their work. When a female employee does not accept his inappropriate behavior, he retaliates by telling them that they "have the wrong attitude" or "don't care about their job" and suggests or threatens that they might be better off working in another office.

29.     The document written by Complainant 2 listed many examples of inappropriate comments by Lopez personally witnessed by Complainant 2, as well as other examples of inappropriate comments by Lopez conveyed to her by other employees in the office.

30.     On information and belief, one or more members of Silver's staff made Silver aware that Complainant 2 had filed a written complaint about Lopez with the Majority Counsel's office.   Nevertheless, the complaint of Complainant 2 was never forwarded to the Ethics Committee.

31.     On or about January 12, 2012, attorneys for Complainant 1 and Complainant 2 delivered a letter to Lopez and Kearns containing further detail concerning the sexual harassment and retaliation complaints by Complainant 1 and Complainant 2.  The letter also stated that Lopez was engaging in acts of sexual harassment and other discriminatory behavior toward other women working in his office.

32.     In January 2012, at the suggestion of Yates, Collins spoke with Arlene Smoler ("Smoler"), a Deputy Attorney General in the Office of Attorney General Eric Schneiderman, about the circumstances of the sexual harassment and retaliation complaints made by Complainant 1 and Complainant 2.  Smoler has significant experience in employment law. Collins sought Smoler's advice about, among other subjects, the Assembly's potential liability to Complainant 1 and Complainant 2.

33.    Collins described the situation to Smoler in general terms without identifying any of the particular individuals involved.   In response, Smoler advised Collins, among other things, that the Assembly had a legal obligation as an employer to conduct a "prompt and timely" investigation into the sexual harassment allegations of Complainant 1 and Complainant 2.

34.    On January 24, 2012, Silver met with Collins, Yates, and Kearns.  All four participants of the meeting, including Silver, are attorneys admitted to practice law in the State of New York.

35.    At the meeting, Collins recounted the advice he received from Smoler. Collins also said that, based on his own legal research, he believed the Assembly may have had a legal obligation to investigate the allegations against Lopez as soon as Complainant 1 first complained to Page.

36.    Despite Collins' statements, neither Silver nor anyone on his staff referred the allegations made by Complainant 1 or Complainant 2 to the Ethics Committee.   Nor did Silver otherwise initiate a "prompt and timely" investigation regarding the allegations of Complainant 1 and Complainant 2, as Smoler had advised.

37.    At no time before Burhans and Rivera complained of Lopez's sexual harassment, *see* ¶¶57-58, *infra*, did Silver or anyone on his staff discipline Lopez for his behavior or to take other meaningful action to prevent him from engaging in further acts of sexual harassment.

38.    In or about March 2012, another female employee on Lopez's staff ("Employee 1") told Kearns that she wanted to be transferred to a different job in the Assembly,

but she did not want Lopez to know that she wanted to leave his office.  Kearns observed that Employee 1 was very stressed and urgently wanted to leave Lopez's office.

39.     The reason that Employee 1 appeared to be in distress was that Lopez had been sexually harassing her.  On information and belief, although Employee 1 did not wish to make a formal sexual harassment complaint, Kearns knew or should have known that Lopez had sexually harassed Employee 1.  Nevertheless, Silver and the Assembly still took no action to investigate Lopez or to ensure that the other women in his office were safe.

40.     Instead of taking action to stop an elected official who was sexually harassing his female staffers, Silver and his staff tried to cover up Lopez's actions and protect Lopez and the Assembly from public scrutiny.   On information and belief, Silver was more concerned about avoiding adverse media attention than he was about protecting employees of the Assembly from sexual harassment.

41.     In or about April or May 2012, Silver and his staff arranged for Employee 1 to be transferred out of Lopez's office to a position on the Assembly's central staff.

42.     Following a private mediation process, the Assembly and Lopez agreed to pay Complainant 1 and Complainant 2 a combined total of $135,080 in settlement of their potential claims.  The Assembly paid $103,080 of the settlement; Lopez paid the balance.

43.     As part of the settlement, the Assembly and Lopez insisted that the complainants agree to complete confidentiality about the terms of the settlement, the fact of the settlement, and their allegations against Lopez.   As a result, neither Complainant 1 nor Complainant 2 were permitted to make any public statement about Lopez's deplorable behavior or even to warn the other employees in Lopez's office about Lopez.

44.     The settlement among the Assembly, Lopez, Complainant 1, and Complainant 2 was finalized and executed in early June 2012.  By this time, as explained below, Lopez had hired Burhans and Rivera and was sexually harassing them.

Lopez Sexually Harasses Plaintiffs

45.     On or about April 16, 2012, the Assembly hired Burhans as a Legislative Aide on Lopez's staff.   In order to take the position with Lopez, she resigned from her previous employment as a Legislative Aide for a prominent union and moved from the Albany area to New York City.  At the time, Burhans was 26 years old.

46.     On or about April 17, 2012, the Assembly hired Rivera as a Legislative Aide on Lopez's staff.   At the time, she was 24 years old.  Prior to working for the Assembly, Rivera held internships with a member of the New York City Council and the Legal Services Corporation.

47.     Before Burhans and Rivera began working for the Assembly, they each separately interviewed with Lopez.  Neither Burhans nor Rivera had met Lopez before their interviews.

48.     Plaintiffs were based out of Lopez's district office in Kings County, but plaintiffs' duties required them to go to various counties in the State of New York, including New York County.

49.     Within six weeks of hiring plaintiffs, Lopez began to sexually harass them.  As detailed below, Lopez's conduct included: a) repeated comments to plaintiffs about their physical appearance, their bodies, their attire, and their private relationships; b) repeated unwelcome sexual overtures; and c) repeated inappropriate and unwelcome physical contact.

50.     Lopez used his position as a public official and employer to demand that plaintiffs accept, and even welcome, his outrageous behavior in order to keep their jobs.   For example, Lopez repeatedly required plaintiffs to communicate to him -- often in writing -- that they cared for him, that they admired him, and that they loved their jobs and being with him.

51.     On information and belief, Lopez sought these affirmations both because it gratified his ego to hear compliments from young women and because he sought to collect "evidence" that he could use against plaintiffs if they ever complained about his acts of sexual harassment.

52.     Lopez also required that plaintiffs be available at virtually any hour of the day or night to respond to him.   Moreover, he required Burhans and Rivera to spend countless hours, including late nights and weekends, in his presence.   Lopez did not impose these requirements because of any work necessity, but simply because he wanted Burhans and Rivera to be near him for his personal gratification.

53.     When plaintiffs submitted or acquiesced to Lopez's inappropriate behavior, he repeatedly said that he would raise their salaries, referred to each of them as his Chief of Staff, and dangled the prospect of promotions.   However, when plaintiffs refused his requests or rebuffed his offensive behavior, Lopez often became enraged and threatened their jobs.

54.     By his words and deeds, Lopez made it clear to plaintiffs that their submission to his sexually harassing conduct was a non-negotiable term of their employment.

Examples of Lopez's Harassment of Burhans

55.     The following are examples of Lopez's sexual harassment of Burhans in the period between May 2012 and July 2012:

a.    On multiple occasions while Lopez was driving and Burhans was in the passenger seat of his car, including a trip to Atlantic City described below, Lopez required Burhans to massage his hand.  When Burhans submitted to that request, Lopez sometimes pushed his hand in between Burhans' legs, forcefully touching her inner thigh.  Burhans would attempt to move Lopez's hand up and off of her, but Lopez would not stop.

b.    Lopez frequently told Burhans that she should not wear a bra. On one occasion, Lopez told Burhans that she looked nice, but he would rather she not wear a bra, and then proceeded to snap her bra from the back.

c.    While at the Bushwick United Democratic Club, Lopez asked Burhans if she would accompany him on a trip to Russia and sleep in the same bed with him.  When Burhans communicated that she would not do that, Lopez became very upset and stormed out of the Club.

d.    Lopez frequently and falsely accused Burhans of having a prior sexual relationship with a former supervisor of hers. Burhans asked Lopez to stop making such statements because it made her uncomfortable, but he persisted in doing so.

e.    When in Albany, Lopez asked Burhans if she would kiss him if the Assembly passed certain legislation they had worked on. Burhans replied: "on the cheek," but Lopez insisted that it be on the lips.

f.    On another occasion in which Burhans and Lopez were in Albany, he asked her if she would like to stay over at the Governor's Executive Mansion.  Burhans replied that she would enjoy going on a tour of the Mansion.  Lopez responded that she would have to stay overnight, which he referred to as a "Lincoln bedroom" situation.  Lopez further stated that

Burhans would need to be "naked" during the visit and suggested that this would be how he would get a housing bill enacted into law.

g.      Lopez also said to Burhans that he was going to set her up with a senior member of the Governor's administration and that she should have sex with this man to get Lopez's housing bill passed.

h.      Lopez required Burhans to accompany him on a trip to Atlantic City, a trip for which there was no work purpose.  Before the trip, Lopez told Burhans that she should not wear a bra on the trip, which, as stated above, was a frequent obsession of his.  When Burhans defied Lopez's instruction and wore a bra, Lopez became very angry and refused to talk to Burhans for hours.

i.      When Lopez and Burhans arrived in Atlantic City, Lopez insisted that they go up to a room he had reserved at the Borgata Hotel in order to "freshen up."  While they were in the hotel room, Lopez tried to kiss Burhans on the lips.  Burhans repeatedly said "no" and "what are you doing" and had to push Lopez away several times before Lopez stopped his advances.

j.      Lopez told Burhans that she should grow her hair out to make it look more like Rivera's hair.  Lopez said to Burhans that Rivera "used her hair to be sexy."

k.      Lopez told Burhans that she and Rivera were "well endowed" and that Burhans should "play that up."

l.      On multiple occasions when Lopez was angry, he called Burhans a "bitch."

m.      On many occasions, Lopez told Burhans that she should wear short skirts to work and that she should use her sexuality in meetings, including crossing and uncrossing her

legs to get a reaction.  Lopez further said that watching the reactions of other people to Burhans excited him and turned him on.

Examples of Lopez's Harassment of Rivera

56.     The following are examples of Lopez's sexual harassment of Rivera in the period between May 2012 and July 2012:

a.      Lopez frequently asked Rivera to wear mini-skirts, button-down blouses and high heels for him.

b.      Lopez told Rivera that he considered her the most attractive person in the office.

c.      Lopez frequently asked Rivera to massage his hand for him, purportedly because he had lost feeling in it.  On one occasion, Rivera submitted to this request and massaged his hand.

d.      Lopez also asked Rivera to give him a manicure.  According to Lopez, giving him a manicure would demonstrate that Rivera cared for and respected him.

e.      Lopez required Rivera to meet with him twice a week after work at bars or restaurants, purportedly to discuss work-related matters.  However, these meetings quickly devolved into matters unrelated to work, as Lopez told Rivera that he needed her to be his "therapy."  At these "therapy" sessions, Lopez told Rivera that she had beautiful eyes and that he liked being "with a hot chick."

g.      Lopez frequently tried to hold Rivera's hand.  When Rivera pulled her hand away, Lopez became angry.  On one occasion, Lopez grabbed Rivera's hand and when she tried to pull it away, Lopez tightened his grip and counted to sixty until he released Rivera. Rivera was crying during this countdown.

h.      Lopez repeatedly spoke with Rivera about the problems he had in the relationship with his girlfriend, and how he was "floating from woman to woman."  Lopez also constantly pried into Rivera's relationship with her boyfriend, and refused to accept that Rivera did not want to discuss it with him.

i.      Lopez asked Rivera to accompany him to Atlantic City, purportedly for more "therapy" and because he wanted a "hot chick" to be with him.

j.      After Burhans' rejected Lopez's invitation to go to Russia and share a bed with him, Lopez asked Rivera to take the trip with him.  Lopez told Rivera that she would never be allowed to leave his side and that she would have to get drunk with him.

k.      Lopez asked Rivera to accompany him on a five-day trip to Quebec, which was another trip with no work purpose.  When Rivera turned down this request, Lopez became enraged and, as punishment, began to take away some of Rivera's work-related duties.

l.      Lopez repeatedly told Rivera that her lack of romantic interest in him was because Rivera was purportedly a lesbian.  In response, Rivera consistently replied that her sexual orientation was none of his business.  Nevertheless, Lopez frequently told Rivera that he wanted to set her up with various lesbian elected officials.  Lopez added that he thought this would be "very hot."

m.      On many occasions, Lopez asked Rivera about her sexual history.  When Rivera again told him that the subject was none of his business, Lopez became angry and told Rivera that she was too conservative and that she should "stop putting up walls."  Lopez added that Rivera should be more like the "bra-burners of the 70's."  Lopez also expressed dismay that Rivera was not sexually promiscuous and referred to her as "virginal."

        n.      Lopez repeatedly asked Rivera to come to work without wearing a bra.  At other times he suggested that Rivera should be topless.  He also complained to Rivera that she pulled down her skirt when she sat down.

        o.      Lopez has played with Rivera's hair and frequently stood inappropriately close to her.

        p.      Lopez frequently told Rivera that she did not dress sexily enough for his taste, and that she should learn how to "dress sexy" from a 14-year-old female intern who worked in Lopez's Brooklyn office.  To that end, Lopez attempted to arrange a shopping trip with Rivera and this intern, ostensibly so that the intern could show Rivera how to dress more to Lopez's liking.  When Rivera relayed these and other circumstances to her mother, Rivera's mother became concerned about the welfare of Rivera and the intern and reported this to the police, who visited Lopez's Brooklyn office.

<u>Plaintiffs Leave Lopez's Office and Complaint of Sexual Harassment</u>

        57.     On July 16, 2012, the same day that the police visited Lopez's office, Rivera called the office of Counsel for the Majority and reported to Kearns that Lopez was sexually harassing her.  Rivera did not thereafter return to Lopez's office and was eventually transferred to another position in the Assembly.  Although Rivera has remained an employee of the Assembly, she has suffered a significant diminution in her job duties and responsibilities since leaving Lopez's office.

        58.     On July 17, 2012, one week after Lopez took Burhans to Atlantic City, Burhans called Kearns and reported that Lopez was sexually harassing her.  Burhans did not thereafter return to Lopez's office and was eventually transferred to another position in the

Assembly.  Although Burhans has remained an employee of the Assembly, she has suffered a significant diminution in her job duties and responsibilities since leaving Lopez's office.

Relevant Investigations and Findings

59.    Contrary to the process followed when Complainant 1 and Complainant 2 filed complaints of sexual harassment, the complaints of plaintiffs were referred to the Ethics Committee for investigation.

60.    Following an investigation, on August 24, 2012, the Ethics Committee unanimously concluded that Lopez violated the Assembly's sexual harassment policy in his treatment of plaintiffs.  The Ethics Committee made the following findings, among others:

- "That [plaintiffs'] allegations of unwelcome verbal and physical conduct of a sexual nature were credible."

- "That there was pervasive unwelcome verbal conduct by Assemblymember Vito Lopez toward both [plaintiffs] from early June 2012 until the time they made complaints of sexual harassment in mid- July 2012, including repeated comments about their physical appearance, their bodies, their attire, and their private relationships;"

- "That [plaintiffs'] perception that such conduct created an intimidating, hostile and offensive working environment was reasonable."

61.    The Ethics Committee recommended a series of sanctions that Silver should take against Lopez, including removing him from his position as chair of the Assembly's Standing Committee on Housing and forfeiting all of the seniority rights and privileges he enjoyed in the Assembly.  On August 24, 2012, Silver adopted the recommendations and publicly announced the findings of the Ethics Committee and the sanctions imposed on Lopez.

62.    Before the sanctions against Lopez were publicly released on August 24, 2012, Collins called the attorney for Complainant 1 and Complainant 2 to tell them that there might be media reports related to Lopez and to remind Complainant 1 and Complainant 2 about

their confidentiality obligations under the parties' settlement.  On information and belief, Collins made this call at Silver's direction and/or with his approval.

63.     On information and belief, the Assembly sought to keep the settlement of the initial complainants private because, among other reasons, Silver and his staff knew that if the settlement became public, it would be apparent that the Assembly had not taken reasonable care to protect the women on Lopez's staff from being sexually harassed and abused.

64.     Despite the Assembly's attempt to continue to hide the truth about the initial sexual harassment complainants against Lopez, on August 25, 2012, *The New York Times* published information about the settlement that the Assembly and Lopez reached with Complainant 1 and Complainant 2.  *See* Danny Hakim and Thomas Kaplan, *Before Censure, a Hushed Settlement Against Assemblyman,* N.Y. Times, Aug. 26, 2012, at A1.

65.     After the initial settlement became public, Silver and his spokesperson publicly stated, in substance, that the only reason that the sexual harassment complaints made by Complainant 1 and Complainant 2 were not referred to the Ethics Committee was that the victims did not want such an investigated conducted.  These statements were false.  Neither the initial complainants nor their counsel ever requested that the Assembly not investigate their complaints.  To the contrary, counsel for Complainant 1 and Complainant 2 requested that the Assembly investigate Lopez.

66.     On information and belief, Silver and his staff orchestrated a campaign of false public statements in order to deflect their egregious failure to have taken even the most basics steps to protect Lopez's staffers from Lopez's sexual harassment and abuse.

67.     Shortly after the Assembly's sanctions against Lopez were publicly announced, despite the efforts of Burhans and Rivera to maintain their privacy and anonymity,

19

media reports identified Burhans and Rivera as sexual harassment complainants against Lopez. As a consequence of being publicly identified in this manner, on information and belief, plaintiffs have suffered damage to their reputation and career prospects.

68. Shortly after the Assembly's sanctions against Lopez were publicly announced, the New York State Joint Commission on Public Ethics ("JCOPE") began an investigation into Lopez related to his conduct towards plaintiffs and other women in his Assembly office. JCOPE sought to determine whether Lopez had violated one or more provisions of the New York State Public Officers Law.

69. On or about February 12, 2013, the Commissioners of JCOPE, following an extensive investigation by JCOPE's staff, unanimously found that there was a substantial basis to conclude that Lopez's conduct towards plaintiffs and other women on his Assembly staff constituted multiple violations of the New York State Public Officers Law. These conclusions were set forth in a lengthy "Substantial Basis Report" that contained numerous factual findings related to Lopez's conduct and the Assembly's handling of the sexual harassment complaints against Lopez.

70. Among the findings made by JCOPE at the conclusion of its investigation were the following:

- [S]ince at least 2010, Lopez engaged in an escalating course of conduct with respect to multiple female staff members, including the complainants, that began with demeaning comments about appearance and dress as well as demands for fawning text and email messages, increased to requirements for companionship outside the office, and culminated in attempted and forced intimate contact.

- The investigation found that Lopez rewarded female employees who tolerated his behavior or acceded to his demands with cash gifts, promotions, salary increases, and plum assignments.

- When female employees resisted or were not sufficiently demonstrative in their praise of Lopez or receptive to his overtures, he punished them with removal from important assignments, public berating, and threats of demotion or job termination.

- The investigation also revealed that errors were made in the management and disposition of the complaints against Lopez. The first two complaints against Lopez in December 2011 and January 2012, were not referred promptly to the Assembly Ethics Committee for an investigation.

- In addition, prior to entering into the Settlement Agreement [with Complainant 1 and Complainant 2], there was no investigation into the allegations, nor were there any other measures taken to protect Lopez's remaining female staff.

- Finally, the Settlement Agreement [with Complainant 1 and Complainant 2] contained a confidentiality clause that shielded from public disclosure not just Lopez's conduct, but even the fact that Lopez and the Assembly had settled a dispute relating to Lopez's conduct.

- Based upon the evidence developed through the investigation, the Commission finds that Lopez used the powers and perks of his position as a member of the Assembly to engage in knowing, willful, and prolonged mistreatment of certain female members of his Assembly staff.

71.     The JCOPE report was publicly released on May 15, 2013.

72.     Following the issuance of the JCOPE report, Silver has made public statements acknowledging his "glaring" failure in not referring the original sexual harassment complaints about Lopez to Ethics Committee for investigation.

73.     Silver claims that he now "deeply regrets not referring the original complaint to the [Ethics Committee], and for this [he is] sorry."

74.     Silver has also publicly stated that the "degradation and emotional duress endured by the young women who were harassed [by Lopez] while they served in the Assembly, weighs heavily on me."

## FIRST CAUSE OF ACTION

### Sex Discrimination/Sexual Harassment Under Section 1983

(Against Lopez and Silver)

75.    Plaintiffs repeat and reallege paragraphs 1-74 as if fully set forth herein.

76.    By the acts and practices described above, Lopez, in his individual capacity and under color of state law, discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, including creating a hostile work environment based on sex, thus depriving plaintiffs of their rights under the Equal Protection Clause, in violation of Section 1983.

77.    By the acts and practices described above, Silver, in his individual capacity and under color of state law, personally assisted Lopez in discriminating against plaintiffs in the terms and conditions of their employment on the basis of their sex, including creating a hostile work environment for plaintiffs based on their sex.  In addition, Silver created a policy or custom in which Lopez believed that he could sexually harass the women on his staff with impunity.  Silver's conduct deprived plaintiffs of their rights under the Equal Protection Clause, in violation of Section 1983.

78.    As a result of the discriminatory acts of Lopez and Silver, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation unless and until this Court grants relief.

79.    Lopez and Silver engaged in these practices with malice and with reckless indifference to plaintiffs' federally protected rights.

## SECOND CAUSE OF ACTION

Sex Discrimination/Sexual Harassment Under the NYSHRL

(Against Lopez and Silver)

80.     Plaintiffs repeat and reallege paragraphs 1-79 as if fully set forth herein.

81.     By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, including by creating a hostile work environment because of their sex, in violation of the NYSHRL.

82.     Lopez and Silver are liable under the NYSHRL as employers and because they aided and abetted the sex discrimination and hostile work environment that plaintiffs suffered.

83.     As a result of the discriminatory acts of Lopez and Silver, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

Sex Discrimination/Sexual Harassment Under the NYCHRL

(Against Lopez and Silver)

84.     Plaintiffs repeat and reallege paragraphs 1-83 as if fully set forth herein

85.     By the acts and practices described above, defendants discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex, including by creating a hostile work environment because of their sex, in violation of the NYCHRL.

86.     Lopez and Silver are liable under the NYCHRL as employers and because they aided and abetted the sex discrimination and hostile work environment that plaintiffs suffered.

87.     As a result of the discriminatory acts of Lopez and Silver, plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, and damages for mental anguish, emotional distress, and humiliation unless and until this Court grants relief.

88.     Lopez and Silver engaged in these practices with malice and with reckless indifference to plaintiffs' right protected under the NYCHRL.


PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter an award:

(a)     declaring the acts and practices complained of herein in violation of Section 1983, the NYSHRL and the NYCHRL;

(b)     permanently restraining these violations;

(c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiffs' employment opportunities;

(d)     directing defendants to place plaintiffs in the position they would be in but for defendants' discriminatory treatment of them, and to make them whole for all earnings they would have received but for defendants' discriminatory treatment;

(e)     awarding plaintiffs compensatory damages for their mental anguish, emotional distress and humiliation;

(f)     directing defendants to pay plaintiffs punitive damages;

(g)     awarding plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorney's fees and the costs of this action; and

(h)     awarding such other and further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of he Federal Rules of Civil Procedure, plaintiffs demand a

trial by jury in this action.


Dated: New York, New York
       June 6, 2013

THE LAW OFFICE OF
KEVIN MINTZER, P.C.

By:     _____
        Kevin Mintzer (KM 4741)
        Attorney for Plaintiff
        1350 Broadway – Suite 1400
        New York, New York 10018
        Tel: (646) 843-8180
        Fax: (646) 478-9768
        km@mintzerfirm.com

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*Index N°: To Che*

VICTORIA BURHANS and CHLOE RIVERA,

Plaintiffs,

-against-

VITO LOPEZ and SHELDON SILVER,

Defendants.

.......................................................................................................................................

### COMPLAINT

.......................................................................................................................................

THE LAW OFFICE OF KEVIN MINTZER

*Attorney for*

Plaintiffs

1350 Broadway
Suite 1400
New York, New York 10018
(646) 843-8180

.......................................................................................................................................

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated*                                    *Signature*

                                          *Print Signer's Name*

.......................................................................................................................................

*Service of a copy of the within*                                                    *is hereby admitted*

*Dated:*

                                          *Attorney(s) for*

.......................................................................................................................................

PLEASE TAKE NOTICE

NOTICE OF ENTRY   [ ]   *that the within is a (certified) true copy of a
entered in the office of the clerk of the within-named Court on*          *20*

NOTICE OF ENTRY   [ ]   *that an Order of which the within is a true copy will be presented for settlement to the
Hon*                  *, one of the judges of the within-named Court,
On*              *20*        *at*              *M.*

*Dated:*

                                          **LAW OFFICE OF KEVIN MINTZER**
                                          *Attorney for Plaintiffs*
                                          1350 Broadway, Suite 1400
                                          New York, New York 10018

*To:*